## RAY *v.* STATE TAX COMMISSION

Wendell Gronso, Burns, argued the cause for plaintiff. Wendell Gronso, Burns, and Cramer & Gronso, Burns, submitted briefs for plaintiff.

Theodore de Looze, Assistant Attorney General, Salem, argued the cause and submitted a brief for defendant.

Decision for defendant rendered January 13, 1965.

PETER M. GUNNAR, Judge.

This is a suit to set aside defendant's Opinion and Order No. I-64-23, affirming an additional assessment of income taxes against plaintiff for the calendar year 1961.

The facts adduced at the trial at Burns are as follows: Between June 11, 1958, and July 3, 1961, plaintiffs, who are husband and wife, transferred $7,511 to their son William and his wife, Mellie. Only $3,000 was repaid. William and Mellie used these sums to finance their beer and sundry distributing

business in Winnemucca, Nevada. In 1961, when the business was hopelessly in debt, William deserted his wife and disappeared for eight months. Mellie divorced William and received the insolvent business in the settlement. At this point, plaintiffs determined their advances of $4,511 to William and Mellie to be worthless and claimed a bad debt deduction on their state income tax return for that year.

The questions before this court are:

1. Were these advances a valid debt; and

2. If they were a debt, did the debt become worthless in 1961.

■ ORS 316.330(1) allows a taxpayer to deduct "any debt which becomes worthless within the tax year." Commission Reg. 6.330(1)-(a) defines a debt as "an unqualified obligation based upon a bona fide promise, express or implied, to pay, given upon a valuable consideration." ORS 316.330(1) and the commission construction of it conforms to the federal law on this subject. IRC § 166 (a); Mertens, *Law of Federal Income Taxation,* §§ 30.01 et seq.

This court concludes that the claimed bad debt was not an unqualified obligation to pay. Prior to the time of the advancement at issue, William had worked first for his family at wages and later he and Mellie operated a grocery store in Burns. The grocery store failed, and the plaintiffs had to take it over to get out the monies they had advanced for that venture. From observing the witnesses and listening to the testimony it was clear that neither William nor Mellie had any business ability and that plaintiffs knew this long before June, 1958. Plaintiffs testified that they knew that both William and Mellie were poor bookkeepers and business people and that plaintiffs had to oversee the operation of the business from the first.

Plaintiffs' relations with Mellie became strained because Mellie insisted on keeping the checkbook and was hopelessly inept at doing so. Yet plaintiffs continued to advance monies to William and Mellie. The only advance which plaintiffs recovered was $3,000 which plaintiffs had borrowed from the bank to help William buy a carload of beer and which plaintiffs had collected immediately upon the receipt of the monies for the beer. Otherwise there is no evidence that they tried to collect the advances until after William deserted and Mellie became the sole owner of the business. Though the checks by which the monies were transferred contained the notation "loan," plaintiffs admitted that these notations had not been placed upon the checks until long after their issuance. No note or other evidence of the indebtedness was ever issued to plaintiffs. Plaintiffs have not tried to collect the debt from William, who is now working and living at home.

After listening to the witnesses and observing them in court, this court concludes that plaintiffs advanced these sums to William out of paternal affection with the expectation that they would be repaid if the business was a success and provided sufficient unneeded funds for such repayment. This court also concludes that plaintiffs had substantial doubts that the business would be successful at the time they advanced the money. It also concludes that plaintiffs had little expectation of being repaid and would have been fully satisfied if William had been able to scrape up a living out of the business without repaying them at all.

■ When parent and child enter dealings which result in a tax claim, the case is a difficult one and must be subjected to close scrutiny. *Florence M. Redelsheimer,* TC Memo 1964-60. In such transactions, care

64

must be taken at the time of the original transaction to establish, and thereafter to scrupulously maintain, the business nature of the dealings. Otherwise the possibility of fraud will vitiate any tax benefit either sought or possible.

■ In this case, the transactions took no definite form at the outset. Only after the loss was incurred did plaintiffs seek to establish these dealings clearly as loans. At no time did the alleged debt appear unconditional. There always appeared the parental devotion and the need for William to succeed before the debt became payable. As Merten says: "The liability, in futuro, to pay a sum of money conditioned upon the happening of an event which may or may not occur does not give rise to a debt." 5 Mertens, op cit, § 30.03. Certainly a debt payable only if the business is successful is not an unqualified obligation. *Evans Clark*, 18 TC 780 (1952) ; *Jeremiah H. O'Donnell, Jr.*, TC Memo 1964-38.

Since the advances claimed by plaintiffs to be debts and worthless in 1961 were not unconditional promises to pay, they were not debts in any tax year for the purposes of the bad debt deduction.

This court is informed that, after the trial of this cause, the Internal Revenue Service allowed plaintiffs their claimed bad debt deduction for federal purposes. While the factual conclusion of the federal auditor is entitled to respectful consideration, this court does not reach the same conclusion from the evidence presented to it.

Defendant's counsel shall prepare and submit a decree in accordance with this decision under Rule 38 affirming the additional assessment against plaintiffs for the calendar year 1961 and allowing defendant its costs and disbursements.